IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

IVAN RUSSELL CUNNINGHAM,

 Plaintiff,

v.            CIVIL ACTION NO.: CV610-042

SHANNON HIGGS; WILL HERNDON;
ANDY GAFFNEY; DAVID WILLIAMSON;
and LEE CREAMER,

 Defendants.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently housed at Wheeler Correctional Facility in Alamo, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983. Defendants filed a Motion for Summary Judgment, and Plaintiff filed a Response. Defendants filed a Reply. Plaintiff filed a Surreply. For the reasons which follow, Defendants' Motion should be **GRANTED** in part and **DENIED** in part.

## STATEMENT OF THE CASE

Plaintiff contends that Defendants David Williamson and Lee Creamer of the Lyons Police Department tore his bicep tendon when they arrested him, which caused him a tremendous amount of pain. Plaintiff asserts that medical staff at the Toombs County Jail refused to provide him with medical attention for over a month. Plaintiff alleges that he was over-medicated, fell into a door, and split his head open, and Defendants Officer Gaffney and Herndon "laughed and joked" about his pain. (Doc. No.

1, p. 6). Plaintiff also alleges that Defendants Gaffney and Herndon tased him, and two (2) staples fell out of his head when he fell to the ground. Plaintiff further alleges that he was hogtied and made to wear a football helmet, and Defendant Herndon crammed the helmet down on his head. Plaintiff contends that he was cleaned up three (3) days later and placed in the hole for four (4) weeks. Plaintiff alleges that Shannon Higgs was directly in control of Plaintiff's medical care needs.[1]

Defendants assert that they are entitled to immunity in their official capacities. Defendants also state that they are entitled to summary judgment in their favor on the merits of Plaintiff's claims. In the alternative, Defendants state that they are entitled to qualified immunity.

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant[s] show[ ] that there is no genuine dispute as to any material fact and that the movant[s are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp.2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)), and (Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving parties bear the burden of establishing that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.

---

[1] In his original Complaint, Plaintiff did not provide the Court with a time frame for his allegations. If he had, the undersigned likely would not have served all five (5) Defendants, as Plaintiff's claims against all five (5) Defendants appear unrelated to each other.

2

See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant[s are] entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex v. Catrett, 477 U.S. 317, 322-23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Co., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011).

## DISCUSSION AND CITATION TO AUTHORITY

I.  **Official Capacities Claims**

Defendants Higgs, Herndon, and Gaffney assert that they were acting within the scope of their official law enforcement duties when they detained Plaintiff in the Toombs County Detention Center and obtained medical treatment for Plaintiff. Defendants Herndon and Gaffney contend that they were acting within their official duties when they used reasonable force to keep Plaintiff from harming himself while he was detained. Defendants Williamson and Creamer assert that they were acting within the scope of their official capacities when they arrested Plaintiff for felony aggravated assault and criminal interference with government property. Defendant Creamer also asserts that he acted in his official capacity when he: called for emergency medical technicians to

3

check on Plaintiff at the scene of the arrest; transported Plaintiff to the hospital; and later transported Plaintiff to the Toombs County Detention Center. All Defendants assert that Plaintiff fails to present any evidence of a policy or practice which would allow him to sustain a cause of action against them in their official capacities.

The "Eleventh Amendment immunity bars suits brought in federal court . . . when an 'arm of the State' is sued." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003). "Whether a defendant is an arm of the state must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id. (internal punctuation omitted). In making this determination, a court considers: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309.

The first factor takes the analysis to Georgia's constitution. The constitution designates a sheriff as a "county officer." GA. CONST. art. IX, § 1, ¶ 3(a)-(b).[2] Nonetheless, under Georgia law, a sheriff's office is subject to the control of the State legislature. See Manders, 338 F.3d at 1310. This factor sways the Court in favor of granting a sheriff Eleventh Amendment immunity.

Second, Georgia's constitution grants the Georgia legislature "the exclusive authority to establish and to control a sheriff's powers and duties;" thus, sheriffs are not county employees. Id. (citing GA. CONST. art. IX, § 1, ¶ 3(a)-(b)). This factor also tends to persuade the Court to grant the deputy sheriffs Eleventh Amendment immunity

---

[2] Georgia's constitution labels sheriffs as "county officers" because they are elected by county voters. This "nomenclature . . .reflects a geographic label defining the territory in which a sheriff is elected and mainly operates. It is entirely consistent for sheriffs to be independent of the county government and to be subject to State, not county, control but be called 'county officers' to reflect the geographic jurisdiction in the State." Manders, 338 F.3d at 1312.

4

because the State has "direct and substantial control over the sheriff's duties, training, and discipline and the county [has a] total lack thereof[.]" Id. at 1322.

The third factor, however, cuts both ways. The State of Georgia "funds the annual training of sheriffs, funds the Governor's disciplinary procedure over sheriffs for use of excessive force, and pays for certain state offenders assigned to the county jails under the sheriff's supervision." Id. at 1323. Counties, on the other hand, fund the majority of the expenses of the sheriff's office (jails, the sheriff's salary, and the premium for the sheriff's official bond), pursuant to Georgia statute. Id.

Fourth, Toombs County would not be responsible for judgments against Defendants. Under Georgia law, a defendant county is not monetarily responsible for judgments against deputy sheriffs in tort or civil rights actions. Id. at 1326. However, there is no Georgia law "expressly requiring the State to pay an adverse judgment against [a sheriff] in his official capacity," and so a sheriff would have to pay such a judgment out of his sheriff's office budget. Id. "Because both state and county budgets would be affected, 'at a minimum, the liability-for-adverse judgment factor does not defeat an immunity claim.'" Lewis v. Wilcox, No. 3:06-CV-29, 2007 WL 3102189, at *8 (M.D. Ga. Oct. 23, 2007) (quoting Manders, 338 F.3d at 1328).

In light of these four factors, the Eleventh Circuit found in Manders that a sheriff was an "arm of the state" when working in corrections at a local jail. The Court finds that the four factors as applied to the present case yield the same result as in Manders. Each Defendant was acting as an "arm of the state" in enforcing state law. See Scott v. Mercier, No. CV5:06-33, 2007 WL 2728440, at *4 (S.D. Ga. Sept. 14, 2007) (applying Manders in the context of a Fourth Amendment excessive use of force claim and

AO 72A
(Rev. 8/82)

holding that deputy sheriff was acting as arm of the state in attempting to "resolve a civil dispute involving the custody of minor children, a matter governed by state law"); see also, Mladek v. Day, 293 F. Supp.2d 1297,1304 (M.D. Ga. 2003) (finding that sheriff and sheriff's deputies acted as arms of the state in effecting arrest and subsequent detention). As a result, the Eleventh Amendment immunity bars Plaintiff's claims against Defendants in their official capacities.

II. **Fourth Amendment Claims (Defendants Williamson and Creamer)**

Defendants Williamson and Creamer contend that there is no evidence that they used excessive force in arresting Plaintiff. Defendants Williamson and Creamer contend that they approached Plaintiff, and, as far as they knew, he was carrying an AK-47 and had made threatening comments regarding the police. Defendants Williamson and Creamer state that they placed Plaintiff under arrest by handcuffing him and placing him in the back of the patrol car. Defendants Williamson and Creamer also state that they did not use a taser or any other weapon against Plaintiff. These Defendants assert that there is no evidence that either of them used any unreasonable force in arresting Plaintiff.

Plaintiff alleges that Defendants Williamson and Creamer are not entitled to summary judgment. According to Plaintiff, Defendants Williamson and Creamer used excessive force against him, which caused him to have injuries to his skull, bruises, a concussion, a torn tendon, cuts, and scrapes.

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of an arrest. Graham v. Connor, 490 U.S. 386, 394-95 (1989); Mercado v. City of Orlando, 407 F.3d

6

1152, 1156 (11th Cir. 2005). Claim of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham, 490 U.S. at 388. In order to determine whether the use of force is "objectively reasonable," "the nature and quality of the intrusion on the individual's Fourth Amendment interests" are carefully balanced against "the countervailing governmental interests at stake" under the facts of the particular case. Id. at 396 (internal citations and quotations omitted). The quantum of force employed is measured against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight. Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002). Notably, courts consider the officers' actions "from the perspective of a reasonable officer on the scene, rather than through the lens of hindsight," Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004), recognizing that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Harper v. Perkins, 459 F. App'x 822, ___ (11th Cir. Feb. 29, 2012).

The evidence before the Court reveals that there are genuine disputes as to material facts regarding Plaintiff's contention that Defendants Creamer and Williamson used excessive force against him in effecting his arrest. For instance, Defendants Creamer and Williamson assert that they had information that Plaintiff had an AK-47 in his possession and had made threatening comments about telling the police that he was ready for them. (Doc. No. 93, p. 2). In contrast, Plaintiff asserts that there is no

AO 72A
(Rev. 8/82)

evidence that he had an assault rifle on his person or that he made any threatening comments regarding the police. (Doc. No. 105, p. 2). Plaintiff states that he never ran toward the house when he saw Defendant Williamson and another officer arrive at the house, and the parties agree that Plaintiff complied with Defendant Williamson's orders to get to his knees. (Doc. No. 93, p. 3; Doc. No. 105, p. 2). The parties also agree that Plaintiff complained about having injuries he received on previous occasions, though they disagree as to whether Plaintiff mentioned his previous injuries before or after Plaintiff was placed in the patrol car. According to Plaintiff, despite Defendants Creamer's and Williamson's knowledge about his injuries, including a torn bicep, Defendants grabbed Plaintiff "maliciously", reinjured his torn bicep, and slammed Plaintiff's face down in the dirt. (Doc. No. 105, p. 3). Plaintiff avers that Defendants dragged him to the patrol car and applied "continuous pressure and force" to his injured areas. (Id.).

This evidence, when viewed in the light most favorable to Plaintiff, reveals that Plaintiff had been accused of an act of domestic violence the day before his arrest. Plaintiff does not dispute this accusation. Thus, the first factor of the excessive force claim—the severity of the crime—weighs in favor of Defendants Creamer and Williamson. However, there remain genuine disputes of material fact concerning whether Plaintiff posed an immediate threat to the safety of officers or others and whether Plaintiff actively resisted or attempted to evade arrest by running toward the house. Accordingly, Defendants Creamer and Williamson are not entitled to summary judgment on Plaintiff's Fourth Amendment claims against them. This portion of Defendants' Motion should be denied.

AO 72A
(Rev. 8/82)

## III. Excessive Force Claims in Jail (Defendants Herndon and Gaffney)

Defendants Herndon and Gaffney allege that any force used against Plaintiff on December 5, 2009, was warranted and used in good faith. Defendants contend that Plaintiff was placed in handcuffs and leg shackles after he had a "violent outburst over his refusal to take his prescribed medication." (Doc. No. 92, p. 15). Defendants also contend that Plaintiff sustained injuries on this date because he beat his head against his cell. It was because of Plaintiff's actions, Defendants maintain, that Plaintiff was placed in a "suicide smock" the next day to prevent him from hurting himself. (Id.). However, Defendants assert, Plaintiff slammed himself against the cell door and cut his elbow. Defendants contend that officers tried to place handcuffs and leg shackles on Plaintiff to stop the outburst, and Plaintiff lunged toward them. Defendants aver that Plaintiff refused to comply with orders, which caused them to discharge tasers.

Plaintiff contends that he only refused to take his medication, and for this reason, he was placed in handcuffs and leg shackles and in a suicide smock. Plaintiff states that, despite this, Defendants contend that he lunged at them, and they were forced to use a taser on him.

The Eighth Amendment's prohibition against the use of cruel and unusual punishment governs the amount of force that prison officials are entitled to use. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). An excessive force claim has two requisite parts: an objective and a subjective component. Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994). In order to satisfy the objective component, the inmate must show that the prison officials' conduct was "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994). The subjective component requires a showing that

9

the force used was "maliciously and sadistically for the very purpose of causing harm" rather than a good-faith effort to maintain or restore discipline. Whitley v. Albers, 475 U.S. 312, 320-21 (1986). In order to determine whether the force was used for the malicious and sadistic purpose of causing harm or whether the force was applied in good faith, the following factors are relevant: the need for the exercise of force, the relationship between the need for force and the force applied, the extent of injury that the inmate suffered, the extent of the threat to the safety of staff and other inmates, and any efforts taken to temper the severity of a forceful response. Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009). In other words, to establish a claim for excessive force, the plaintiff must show that (1) the defendants acted with a malicious and sadistic purpose to inflict harm, and (2) that more than a de minimis injury resulted. Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002).

As with Plaintiff's Fourth Amendment claims, the parties offer widely divergent versions of events detailing Plaintiff's Eighth Amendment excessive force claims.[3] Viewing the evidence in the light most favorable to Plaintiff, as the Court must do, Plaintiff asserts that Defendants Herndon and Gaffney repeatedly asked him to simulate a sexual act during medication dispersal on December 5, 2009. Plaintiff contends that he refused to do so, and Defendants Gaffney and Herndon threatened to hogtie him. (Doc. No. 105, p. 9). Plaintiff contends that he emptied his water cup to show that his medications were not hidden in the cup or in his hands. According to Plaintiff,

---

[3] The undersigned notes that Plaintiff was a pretrial detainee when he was housed at the Toombs County Detention Center. Thus, Plaintiff's claims of excessive force and deliberate indifference claims have been analyzed under the Eighth Amendment because "cases involving convicted prisoners and decided under the Eighth Amendment apply equally to cases involving pretrial detainees." Ellis v. Pierce Cnty., Ga., 415 F. App'x 215, 217 (11th Cir. 2011).

10

Defendants Gaffney and Herndon were mad because he would not simulate the sexual act, and, fifteen (15) minutes later, Defendants Gaffney and Herndon came back to his cell, handcuffed and shackled Plaintiff, and slammed him against the wall and cell door. (Id. at p. 11). Plaintiff maintains that he was in tremendous pain, and yet, Defendants Gaffney and Herndon kept tightening the leg shackles to intensify his pain. Plaintiff avers that he blacked out as a result of this attack, which resulted in a cut to his scalp requiring staples. Several hours later, Plaintiff contends that Defendants Gaffney and Herndon (and another officer) tased him immediately upon his re-entry into the Detention Center. Plaintiff also contends that the taser caused him to convulse, and Defendants Gaffney and Herndon laughed at him. Plaintiff also contends that Defendants Gaffney and Herndon stepped on his bare feet with combat boots, resulting in his toes getting broken, pushed him into a concrete bench, and cut his elbow. (Id. at p. 14). Plaintiff alleges that he did not resist in any way, particularly considering that all of his injuries prevented such an act. Finally, Plaintiff contends that a helmet was slammed down on his head, which caused aggravation to the staples in his head, and that the taser caused burning around the staples.

In contrast, Defendants Gaffney and Herndon state that Plaintiff refused to comply with orders to open his mouth so they could determine whether Plaintiff had taken his medication, and that he threw water on Defendant Herndon. In response, Defendants Gaffney and Herndon contend that they received permission to handcuff and shackle Plaintiff. Defendants Gaffney and Herndon also contend that Plaintiff injured himself by slamming his head against the cell door and shouted obscenities at them. Defendants Gaffney and Herndon further contend that Plaintiff went to the

11

AO 72A
(Rev. 8/82)

hospital and was treated for a bruise with a superficial cut to his scalp. (Doc. No. 93, pp. 9-10). After his return from the hospital, Defendants Gaffney and Herndon assert that Plaintiff was placed in a blue suicide smock to prevent him from harming himself again, yet Plaintiff slammed his elbow into the cell door, causing injury. Defendants Gaffney and Herndon assert that Plaintiff once again needed to be handcuffed and shackled and was ordered to back away from the door. Defendants Gaffney and Herndon state that Plaintiff became violent, began hitting the cell door, and refused to comply with their orders. Defendant Gaffney used his taser, which did not work because the prongs struck the suicide smock Plaintiff was wearing, so Defendant Gaffney "dry stunned" Plaintiff. (Id. at pp. 10-11). Defendants Gaffney and Herndon state that they were able to handcuff and shackle Plaintiff and placed the helmet on his head as a precaution.

Defendants Gaffney and Herndon are not entitled to summary judgment, as there are genuine disputes as to whether any force was necessary in these two (2) situations and, if so, whether the extents of the force employed were necessary. There are also genuine disputes as to whether Plaintiff's injuries were more than de minimis. This portion of Defendants' Motion should be denied.

### IV. Deliberate Indifference Claims (All Defendants)

Defendants contend that there is no evidence that they were deliberately indifferent to Plaintiff's serious medical needs. In fact, Defendants urge, the evidence of record reveals that Plaintiff received medical attention every time he complained of a serious medical need. Defendants assert that Plaintiff received medical attention after he fell from the patrol car on the date of his arrest and again after he slammed his head

12

into objects in the back of the patrol car. Defendants also assert that the doctor who treated Plaintiff at Meadows Regional Medical Center recommended—but did not order— that Plaintiff follow up with a neurologist, as scheduled. Defendants further assert that the fact that Plaintiff did not see a neurologist does not mean that they were deliberately indifferent to his serious medical needs. Defendants aver that Plaintiff continued to receive medical attention once he was booked into the Toombs County Detention Center, including receiving prescribed medications. Defendants also aver that Plaintiff received "prompt medical attention[ ]" after he refused to take his prescribed medications and slammed his head into objects in his cell. (Doc. No. 92, p. 18).

Plaintiff contends that Defendants denied him access to medical treatment because they were aware of Doctor Hughes' requirement that he have follow up treatment with a neurologist. Plaintiff also contends that he received injuries to his arm on the date of his arrest, yet he was not allowed treatment for that injury.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon a prison official to take reasonable measures to guarantee the safety of inmates. The standard for cruel and unusual punishment, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions

13

sufficiently harmful to evidence deliberate indifference to serious medical needs." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

In order to prove a deliberate indifference claim, a prisoner must overcome three obstacles. The prisoner must: 1) "satisfy the objective component by showing that [he] had a serious medical need"; 2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and 3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007). A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill, 40 F.3d at 1187) (emphasis supplied). As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327.

The objective medical evidence of record reveals that Plaintiff was seen by a nurse and a doctor at Meadows Regional Medical Center in Vidalia, Georgia, on August 25, 2009, the day of his arrest. The nurse noted that Plaintiff was the historian for his medical history, and that Plaintiff had a history of seizures. (Doc. No. 92-1, p. 6). Plaintiff's pain was noted at a zero on a scale of one to ten, and he had a full range of motion "to all extremities with no loss of function or sensation." (Id.). Plaintiff had a head CT, which revealed no change since his last study, and the clinical impressions

14

revealed Plaintiff had a "contusion", or a bruise. (Id. at 10). Finally, Plaintiff was advised to follow up with his neurologist, as scheduled. (Id. at pp. 10-11).

Plaintiff was also seen in the same hospital on the night of December 5, 2009, with a head injury and a reported loss of consciousness. (Doc. No. 92-2, p. 5). Plaintiff had another head CT and had the approximately one and a half (1½) inch wound to his head treated and closed with four (4) staples. (Id. at pp. 5, 11). Though it appears that Plaintiff was not given medical treatment after he was tased, (doc. no. 95-1, p. 9), Plaintiff did receive medical treatment two (2) days later. Plaintiff had a bruised pinky toe and received treatment for his "abrasion" on his right elbow. (Id. at p. 15).

Despite Plaintiff's assertion to the contrary, there is no evidence that a follow-up visit with his neurologist was prescribed as necessary treatment for him.[4] The emergency room doctor who saw Plaintiff on August 25, 2009, only advised that Plaintiff should follow up with his neurologist, as scheduled. In addition, even though there is no evidence that Plaintiff received medical treatment soon after he was tased on December 6, 2009, he did receive medical treatment on December 8, 2009, and there is no evidence that a bruised toe or a cut on his elbow constituted serious medical needs or that any perceived delay in treatment for the cut to his elbow was improper. Goebert, 510 F.3d at 1327 (where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the factors considered are: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay."). The evidence of record reveals that there are no

---

[4] The undersigned notes Plaintiff's submission of medical records detailing his medical condition prior to his arrest. (Doc. Nos. 11, 52-1, 81-1). However, these records only show that Plaintiff had medical issues and treatment before his arrest and do not support his averment that he did not receive medical treatment on the date of his arrest or in December 2009.

15

genuine disputes of material fact as to whether Plaintiff received medical treatment for his injuries stemming from the August 25, December 5, and December 6, 2009, use of force incidents. Accordingly, this portion of Defendants' Motion should be granted. Thus, Plaintiff's claims against Defendant Higgs should be dismissed in their entirety.

## V. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities, so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez v. Reno, 325 F.3d 1228, 1232 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). Government officials must first prove that they were acting within their discretionary authority. Id. at 1233; Ray v. Foltz, 370 F.3d 1079, 1081-82 (11th Cir. 2004). "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." Hill v. DeKalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1185 n. 17 (11th Cir.1994). Once the government official has shown he was acting within his discretionary authority, the burden shifts to the Plaintiff to show that the Defendant is not entitled to qualified immunity. The Supreme Court has established a two-part test to determine the applicability of qualified immunity: the court must determine whether plaintiff's allegations, if true, establish a constitutional violation, and whether the right

16

was clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001)[5]; Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

Defendants' assertion that they are entitled to qualified immunity in their individual capacities on Plaintiff's Fourth and Eighth Amendment excessive force claims is without merit. Plaintiff's claims, if true, show that Defendants violated his clearly established constitutional rights. This portion of Defendants' Motion should be denied.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part. Plaintiff's claims against all Defendants in their official capacities and his deliberate indifference claims against Defendants Williamson, Creamer, Gaffney, and Herndon in their individual capacities should be **DISMISSED**. Plaintiff's claims against Defendant Higgs should be **DISMISSED** in their entirety. Defendant Higgs should be **DISMISSED** as a named Defendant. However, Plaintiff's Fourth and Eighth Amendment excessive force claims against Defendants Williamson, Creamer, Gaffney, and Herndon in their individual capacities should remain pending.

**SO REPORTED** and **RECOMMENDED**, this 11th day of June, 2012.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

---

[5] In Pearson v. Callahan, 555 U.S. 223, 236 (2009), the Supreme Court held that courts can exercise discretion in deciding which of the two Saucier prongs should be addressed first in light of the particular case at hand.

17